Good afternoon. Day one of a four-day sitting for this panel, but the other days are next week, so this is supposed to be an emergency. I don't know if we seem to have treated it quite as quickly as the Supreme Court might have anticipated, but I think you have well briefed the issues for us, and the time is right to hear what your arguments are. For our recording, I will announce that this is case number 25-10534, now called W.M.M. v. Donald J. Trump, Donald J. Trump et al. I'm looking for my list of players. Here we are. We'll hear from, still called A.R.P. first, Mr. Gerlert. Correct my pronunciation, please. No, that was great. Thank you, Your Honor. Now, are you just playing to the court, or is that actually how you pronounce your name? I'm sorry? No. Is that the right way to pronounce your name? Yes. Good afternoon, Your Honors. May it please the Court, Lee Gerlert for the petitioner's appellants. I want to start with the threshold question of whether the proclamation satisfies the Alien Enemies Act. Isn't the threshold question whether that question is even judicially reviewable? Your Honor, I can start with that. There's no question that this court has jurisdiction to interpret the statutory terms. The Supreme Court said that in the JGG decision and quoting Ludecky. We think that this court can give meaning to the statutory terms, and when it does, we think the proper interpretation is that this statute requires military conflict with a foreign government. That's all that this court would need to do, because the government does not claim that the proclamation says we're in a military conflict with Venezuela. So the court would not have to go beyond that. The face of the proclamation, as the government concedes, does not say we're in a military conflict. So I agree with you that we have jurisdiction. Before we get to your conclusion, which is that you need military conflict, and we can talk about the fact that the proclamation uses the word military, talks about regular warfare. We can get to that, but there's an intermediate step that you're losing me on, and I want to make sure I'm understanding the argument. What exactly in Ludecky are you relying on for the proposition that we get to, in a court of law, second-guess the President of the United States when he says this is a conflict that triggers the Alien Enemy Act? I've got the opinion in front of me. Show me the language. No, it's quite right. I thought you were going to show him the language. Your Honor, I think the language we are pointing to is the same language that JGG quoted, which is the proper construction of the statute, the validity of the statute, and the constitutionality. And so that's what we're asking the court to do, is give meaning to those terms. So if I'm understanding what JGG cites, and what I understand your answer to the question to be, is the following sentence. Barring questions of interpretation and constitutionality, the Alien Enemy Act of 1798 is such a statute. Do you recall what such a statute is in the court's phraseology? I'm sorry, Your Honor, what they're referencing? Yeah, so the sentence that you're referencing. I think they're referencing statutes that preclude judicial review, but they're saying this one is not, because they're saying this statute can be reviewed. And certainly, in recent times, the Supreme Court has made clear that statutory terms can always be reviewed. And in fact, I'm not aware of any Supreme Court case, as Judge Kavanaugh pointed out, in the El Shifa case, where you can't construe the terms. So all we're asking is that these terms be interpreted. And we think when you, and I know you want to get to that later, when you properly interpret them, it requires a military conflict with a foreign government. And since the government itself is not claiming that we're in a military conflict, that would be the end of the matter, in our view. Counsel, let me ask you about the categories that the AEA permits this sort of proclamation to be issued under. It does seem to me your best argument to when you rely on the most is this is a predatory incursion. It seems to me that what's been cited by both sides is that we look to founding documents, founding era documents. We're looking at Indian raids and perhaps some during the Kwazii War, some risks of privateers coming into our ports. What does, what would you say the elements, I'm not saying invasions off the table or anything else, but if looking at your sort of sense that predatory incursion is the one to focus on as the strongest one for the government perhaps, what do you say the elements for predatory incursion are? I think that we would say, along with Judge Henderson and Judge Rodriguez, who looked at 134 sources, that it has to be an armed, organized force. And so what I would say is a few things about predatory incursion is that the founders were not looking at this as some subtle clandestine thing. That was the, in fact, that was the Alien Friends Act that talked about during peacetime you could go after dangerous individuals who operated in secret machinations. And so this was the opposite. This was a precursor to all-out war. And the framework I think tells you everything. This is alien enemies. And what alien enemies meant is when we were at war with another nation, we can attribute hostilities to every single citizen. That's what this was about. And the government has no response to the fact that this was about alien enemies. That overlays the entire statute. That's what this was about. So when we talked about predatory incursions, you know, the contemporaneous sources are far in our favor, the background. But what this was about was the Congress did not sit all the time back then. And so if the Congress was not sitting, people were worried we would get caught flat-footed. I understood. Counselor, let me move you a little bit further. You've got a lot to say, and we may give you extra time since this is our only case today with my colleague's permission. It does seem to me when I talk about what the elements are, you said it needs to be military. Well, here the President is proclaiming that you have directed by interwoven with the Venezuelan unrecognized government by us, these terrorists. And they're undermining really civil society here by their actions. It may not be preparatory to an invasion, but it is having the kinds of effects within the cities in which they're operating, the areas in which they're operating, that sort of preparation for an invasion might have. I mean, I'm having a hard time drawing the line. Why this sort of, if it is government or nation-directed, you're going to tell me why it's not, but nonetheless, not yet. Why wouldn't this be similar to what privateers are doing, what Indian tribes are doing, which is a temporary incursion into some area, causing damage, escaping back out, except here that these are staying in place, unfortunately? Yes. So the founders were concerned with large scale activity. This is sort of isolated crimes, and even the government is— Well, the Indian tribes temporarily rage when— But I think the evidence shows that Indian tribes, when they operated in large scale forces, were treated as incursions. The only reason that we didn't invoke the alien enemy, or felt we couldn't, assuming we even wanted to, was because they weren't a sovereign nation. And the privateers were officially a part of another government. So I don't think that the founders were looking at subtle ideas. I mean, that's what the Alien Friends Act was exactly about. There were dangerous people coming to our country, often in secret machinations, clandestine, and this was about war. And the reason we know that is because of the Alien    not saying that the alien enemy has to be used when we were at war. And so this was solely about war and serious military conflict at a size where we would respond with our military. And no one's suggesting that the military has or would respond here. And I think I want to come back to the fact that even the government is not really arguing that this is military conflict. As you said, Your Honor, they're trying to broaden what predatory incursion is, but they're not saying we're in armed conflict with Venezuela. And I think the reason is because they're, the implication is so amazing. President is saying irregular warfare, irregular warfare. It's not as if they're unaware of the need to try to possible need to fit it into that. So why isn't irregular war somewhat? Some of what we've been talking about already, it was going on 225 years ago. I think our answer to that, Your Honor, is that the irregular warfare is just a label thrown in the proclamation. But as Judge Henderson pointed out, when you actually look at what the proclamation is claiming is happening, it's migration, it's regular crimes. And in fact, if you look at the government's declaration from Mr. Smith, it talks about this as crimes and law enforcement. Maybe regular crime in the sense that crime, theft and murder and whatever else is regular. But it certainly is a proclamation that says it's a much more serious, directed by a foreign government, spread of crime within this country that is undermining our democracy, though that word may not be there. But that's, of course, a lot of gangs, a lot of different types of crimes. And that's why we've only responded with law enforcement. I want to put it this way, maybe. I think the government is not claiming we're in armed conflict with Venezuela because they understand the implications. If we really were in a military conflict with Venezuela, it would mean our military could shoot TDA members because they'd be combatants. It would mean the Geneva Convention would kick in. We'd have to treat people under the Geneva Convention. We would have to go to Congress and have all series of things. So I think the government is trying to have it both ways. They don't want to say we're in an armed military conflict with Venezuela, but they would like to... Well, even if it wasn't, even if the Alien Enemies Act clearly applied, none of it would suggest that you can shoot the aliens who are in this country who are citizens of this other country. We would be at war. We would be at war, but it wouldn't affect how the government's responding to individuals in this country. Well, I think it would because we generally don't criminally prosecute combatants, et cetera. That could be, but insofar as this... You're a good advocate, but insofar as saying that this would turn loose law enforcement not to obey the normal rules on arresting people and whatever else seems a bit... We wouldn't generally prosecute people. We wouldn't treat them as law enforcement. We would be talking about the military. But again, coming back to the framework of the whole statute, what Congress was looking at is they wanted to bring us in par with the law of nations. The law of nations said, look, if you're at a war, a military conflict, you can name everybody an alien enemy. That's the only time you can do it. They started with declared war, that was obvious, but then it was clear that France might attack when Congress wasn't in session. They added invasion and predatory incursion as defensive wars so the president was not hamstrung until Congress got back. That was the whole backdrop. The government has no response to why the framework is all about alien enemies. They're trying to look for contemporaneous sources to broaden predatory incursion. I think I can go through those few sources, but they're overwhelmingly in our favor as Judge Henderson and Judge Rodriguez pointed out. The backdrop, I think the government is also setting up a false choice as if these TDA members are going to roam free if we can't use a wartime statute. As the amicus brief by former government officials explains, we don't generally treat gangs like this. There are many tools. There's the alien terrorist court. There is criminal prosecution. That's how we deal with them. That's how the government, in fact, is dealing with it. I mean- Counsel, can you point to me, I didn't get an answer to this question the first time so I'm where the Supreme Court has said you can, as a federal court, countermand the president of the United States in his determination that we're in an armed conflict. I'll take anything. I would take calling out the militia. I would take, in fact, it doesn't even need to be the president. What about the governors calling out militias under their powers? Can you think of an example where the Supreme Court has said the chief executive says this is an armed conflict or this is an insurrection or this is an invasion? Any of the various pieces that are in the statute and the court has said, federal courts, you can countermand it. Well, I think that Boumediene is an example where- Boumediene? The extraterritorial application of the habeas power? I want to just- I'm sorry, I can't- I'm sorry, Boumediene, where the court said the suspension clause requires habeas notwithstanding that we were in a war and the government said we don't want to provide habeas because- As you know, Boumediene was a case about the extraterritorial application- Right, about the suspension. It has nothing to do with countermanding the president. But I think when the president declares that he wants to use the armed forces like he just did with Iran, he's using inherent article two power. Now, he's going to have to go to Congress, he did go to Congress, and there's all sorts of things that he'll have to do, but that's not pursuant to this statute, which the Supreme Court has specifically said you can interpret these provisions. If the court didn't believe that you could interpret these provisions, it would have been meaningless for them to say in Ludecky and JGG. Counselor, we're talking past each other. I agree with you that we can interpret them. I agree with you that we have jurisdiction. But the question is, in reviewing them, are we allowed to conduct a federal trial to countermand the president of the United States when he says this is an invasion or an attempted invasion of the various other terms in the statute? Yes, your honor. And I'm asking you, please, if you don't have a case, just say no, this would be the first one. We hear cases like that sometimes. But do you have a case where the Supreme Court has said, yes, you can countermand what the president said? I don't have a case like yours. I appreciate the candor. But what I would say, two responses, if I could, your honor. Please. So the first is, if the court didn't want you to be able to take action, it wouldn't have said you could construe these terms. The second point is, once you construe the terms, let's, for example, assume that you construe them in our favor to say it requires a military conflict. The government itself is not claiming there's a military conflict. If this court could declare that it requires a military conflict, it would have to be able to take action to say, well, does the proclamation on its face set forth a military conflict? And that's, we don't even have to go to the proclamation. The government itself is saying we're not in a military conflict. So I think we're not countermanding the president. You're If you couldn't, in your words, countermand the president, there'd be no reason to even interpret the statute. Well, there's lots of questions that we can review. I'm just asking if that's one. I mean, your principal argument is to say the president of the United States in the proclamation says that the TDA has infiltrated the military arm of the Maduro regime and has conducted a regular warfare in the United States. Warfare appears four times. Military appears one time in the face of the proclamation. And my question to you, which I appreciate your answer, is can we say, no, that's not military, and that's not the sort of stuff that the AEA allows. Absolutely. Otherwise, if you weren't able to do that, there would be no reason to bother even interpreting it. And I don't even think you would need to be saying this. You would just take the government's concession that we're not in armed conflict, in military conflict. But I see my time is up. I want to, if I could just Well, let me say, as I indicated earlier, I want to make sure that Judge Odom had as full an answer from you as you could give. Why don't we give five more minutes, because we haven't discussed notice yet and the parameters of that. The question I have on notice is what does the Supreme Court mean by the order that it gives to us? What are we supposed to determine on notice? Is there some sort of generic description of the level, the parts of the notice that must be sent out by the government? How much notice do you mean? How quickly must it be given a list of lawyers, whatever else may go into it? Is there one answer if it's all, or is this a factual issue that Judge Hendricks would have to get involved with? Your Honor, that's a fair question. And I think because it's How about my other questions? Were they fair? That's all right. Because it is in a unique posture. So I think you might want to be writing in a more broad sense and ultimately Judge Hendricks could figure out particular facts. But I do think there's four things that are elements that need to apply. The first is the amount of time. We do think seven days is too short and we do have factual material in the record explaining why that is, because it's very hard to reach detainees in these detention centers. It's hard for them to call out. It's hard to find lawyers who actually know how to do a habeas corpus. This is very complicated. So that's why we think 30 days and that's what was in World War II. The second part, which we think should be uncontroversial, is that the notice be served on counsel. So some of these detainees have immigration counsel because they were taken out of immigration proceedings. It should be served on the immigration lawyer and it also should be served on us as counsel. So I think those are the sort of basic elements that we see that are critical. I think there's a few more that we've set forth in our brief. I think there is enough factual material in the record for you to outline it. I recognize that you may want to not get into details and it may be for Judge Hendricks on remand to get into more detail. And I think if the government can show that some detention centers allow access immediately and detainees can get in there and there's plenty of, I think, you know, there possibly could be a different rule. My concern with that is it seems not the norm. The government came up with a particular notice. It was not sufficient. The Supreme Court says it's now come up with another notice. And the idea that the amount of notice that is going to be sufficient on the AEA is going to vary detention center by detention center seems a bad fit for what the Supreme Court perhaps has told us to do. Do you have any reaction to that concern of mine? Yeah. I mean, I think a bright line rule is probably better and it's probably better for the government. I suspect that's why the government is offering a bright line rule. I think that our factual submissions are tailored, obviously, to detention centers here in Texas, I mean in Texas, in this district. But, you know, I think they're probably applicable broadly if the government wants to say we want a different rule in different circuits. But I do think the Supreme Court is saying, the admonition, I think, to the government is it has to be meaningful notice and you really, to actually file, and they use the word actually, to actually file a habeas corpus petition. And the government's talked about administrative proceedings. Those are much easier where the person's sitting in front of an officer and they just say, I'd like to have this hearing. I mean, it's not easy for them to understand what's going on. The list of lawyers are not specific to habeas corpus lawyers. So I do think, but your question is a fair one of whether it should be district by district. I think the government will have to decide once this court lays down broad principles or the Supreme Court ultimately lays down broad principles, if they want to respond. But I do think the factual material shows that seven days is too short. And I don't see any legitimate reason for the government not to serve the notice on counsel when they know there's counsel. If I could just say one more word about the merits, if that's okay, Your Honor. We only talked about predatory incursion and whether that has to be of a military nature. I just want to briefly talk about the second prong, which is the foreign government nation, that there has to be a foreign government nation. And I think the beginning and end of that is that they haven't named Venezuela. And I think that's not a drafting error. They have named TDA in the proclamation. This is against TDA. The government originally argued in the district court, TDA is a foreign nation or government. They've changed their position now and trying to say TDA is entwined with Maduro. But you need to name the country. And again, this is not a drafting error by the government. The implications of saying we are at war with Venezuela would not contradict the CIA's testimony in Congress in March that we are not at war, we're not being invaded by Venezuela. But all of the other implications I talked about are saying we're at war with a foreign government. And so I think the government is really trying to have it both ways. This is exactly what the Alien Friends Act did, which Judge Henderson pointed out. It specifically said there's dangerous people in this country. We want to get at them, like Your Honor is suggesting. And they might be doing it in secret. We want to get at them, even if it's peacetime. That was roundly criticized, ultimately allowed to lapse. And that was the whole point of the Alien Enemies Act. It was a very serious statute with sweeping powers only to be used in wartime. That was the very purpose of, that's the purpose of designating alien enemies. That's why it's called the Alien Enemies Statute. All right, Counselor. Thank you, Your Honor. I think that's all the questions you have time for rebuttal. Good afternoon. May it please the Court. Drew Ensign, Deputy Assistant Attorney General for the United States. From the Civil Division? From the Civil Division, Your Honor. The President's proclamation is plainly a lawful exercise of his extensive powers under the Alien Enemies Act, and the revised notice procedures adopted on remand comport with the requirements of due process. The President's determinations of the prerequisites for invoking the AEA are subject to only extremely limited and deferential review. The Alien Enemies Act has only two relevant prerequisites here, both of which rely solely on the President's findings in the realm of military conduct and foreign affairs, where the President is due the utmost deference. It is for this reason the Supreme Court in Ludecky refused to question the President on whether a declared war existed long after the shooting had stopped in World War II. Counsel, let's say we change the facts in Ludecky there. The President said, I guess President Truman after the war was over, that some, that we were still at war. It may not have been a proclamation, but something the Supreme Court relied on. And then in 1952, Congress withdrew the resolution, whatever they needed to do, to end the January 1941 declaration of war. Let's reverse the facts. Let's say Congress had already declared the war over before Ludecky gets up to the Supreme Court. But President Truman, or whatever President was, was saying, no, we still have hostilities, we still have worries about these aliens in our midst. Would have been the Supreme Court's proper ruling then. That obviously is a different fact pattern. I think it would involve some- I'm trying to figure out what you're saying the role of the President is and when it is reviewable. Declaration of war is a different category than, because you don't have Congress involved in the two matters that you want to urge in front of us, I think. So I'm asking, what is the President's role in the declaration of war if the President indeed had been doing exactly the same thing that he was doing in Ludecky, but Congress had already said game, set, match, no more war? Your Honor, I think declared war is different. And that's important because Congress went out of its way to expand the Alien Enemies Act beyond that. But as to declared war, Congress has a constitutional role. So even in wartime, not in wartime, even in national defense, even in declarations of war, even in use of our time powers, there is reviewability of the President's declaration at times. Your Honor, as to declared war- It's an unfair, maybe hypothetical, I'm not trying to press you too much on it, but I'm trying to indicate that there are things that maybe get reviewed under the AEA. Your Honor, I think declared war would be kind of exceptional and unique because in that scenario- It is. Presumably the Congress passed a resolution that the war was over and presumably did so over the President's veto. In that context where Congress has a specific role under the Constitution as to whether or not there's a declared war, that is the sort of interbranch dispute that is more likely susceptible to judicial resolution, whereas as to invasion or predatory incursion, those are aspects of military affairs and foreign affairs in which the President has given extraordinary deference. And indeed, Ludecky suggests it's not reviewable at all. But doesn't Ludecky say among the things that were reviewable is whether in fact there was a war? Your Honor, it has language on both sides, I will acknowledge. I think the better answer is that that's not reviewable. And the way to see that really is, Justice Black in dissent, for example, recognized that the idea that World War II was still ongoing was, quote, pure fiction, end quote. And no one really disputed that. If there was any sort of factual inquiry into the real facts on the ground, the Truman administration would have lost. But because that inquiry wasn't open, that's why Ludecky came out how it did. I don't think... Well, what can we interpret? What did Ludecky mean? What does JGG mean? Did I have too many G's there? JGG mean, when it says that our role is to determine matters of interpretation or constitutionality. Your Honor, I think you can construe the terms of the statute as they've recognized. Specifically what terms? What's that? What specific terms can we interpret that are relevant in this case? I think all the terms of the AEA can be construed, but as to the President's determination that the facts meet those definitions, that is not reviewable under Ludecky. So we can interpret what an invasion is, what a predatory incursion is, except without question, the President's facts in his proclamation see if they match up. I think that's the best and correct reading of Ludecky, but to the extent that this Court thought otherwise, any review that's available would be extremely deferential. Well, let me ask you about the stipulated facts that were introduced last week by order of this Court, joint stipulation of facts. What's the relevance of those in your understanding of our role in this case? Excuse me, Your Honor, the facts that have come in. The different declarations from the government that have been filed in other cases? Your Honor, if I'm understanding, did the declarations in this case? They were filed in this case, but they came from other cases, did they not? They came from other cases by stipulation, given the odd procedural posture of this case. Okay, so what's the relevance of all those factual statements? Aren't they going sort of supporting the President's proclamation, but you're indicating we can't go behind the proclamation? Your Honor, I think it provides further support, and I think it provides arguments in the alternative. I mean, I think our position, our frontline position would be that the President's determination that the factual prerequisites of the AEF have been met is not subject to judicial review, but if it is, it's subject to extremely deferential review, and I think the President could either rely on the facial validity of the proclamation or of evidence submitted in court, because at that point, if there's evidence submitted in court that would support the proclamation, you could simply issue a revised proclamation that would exalt form over substance, where, you know, where support exists for it, there would be no purpose for a court to exercise powers in equity when it's clear the President could have done what he did, and making him go through the exercise of a second proclamation, you know, serves no function. And I think that evidence is extremely important here, and I'd like to highlight a few key facts. One is that it's established and not disputed that TDA is present in over 40 states in this country. That is an extremely broad physical presence. It's also established that they've taken over apartment buildings in which they exercise control, and are essentially a law unto themselves. Notably, we think that satisfies even plaintiff's construction of the various terms, and you can search in vain for the word apartment in their opening or reply briefs, you won't find it. You have no explanation before this court how that permanent physical occupation and taking over of apartment buildings within the sovereign territory of the United States does not satisfy the predatory incursion or invasion language of the AEA, and so we think that alone is dispositive. The third piece of crucial evidence is the FBI has assessed that it's likely the TDA will try to carry out targeted assassinations of the Maduro regime in the next six to 18 months, as indeed they have done in Chile. They kidnapped and murdered a former Venezuelan army colonel who was a critic of the Maduro regime and had asylum in Chile, and the FBI has determined that it's likely the TDA may try to do the same political assassination of Maduro regime, not TDA critics, Maduro regime critics in the United States, so we think all of that evidence clearly supports the president's determination that an invasion and predatory incursion has occurred. It also very clearly supports that TDA is carefully, you know, is tightly bound up with the Maduro regime. Again, TDA is not assassinating its critics, although it certainly kills plenty of them. The FBI has assessed, as was done in Chile, that it's going to assassinate regime, sorry, critics of the Maduro regime, thereby establishing it as a proxy of the Venezuelan government, much as the privateers were proxies of the French government in the Quasi-War, so we think that also is very powerful evidence that supports the president's determination as the foreign nation or government prong. You know, I think you can even kind of see the incoherence of their argument on this point if you look to pages 16 and 17 of the reply brief. Here's the two sentences they have in a row. The proclamation also does not allege the Venezuelan government actually controls TDA activities. It declares that TDA is undertaking actions both directly and at the direction of the Maduro regime. I mean, that's exactly what the sort of control the proclamation properly alleges. Um, plaintiffs appear to contend that because TDA members are only a subset of citizens of Venezuela, that the proclamation is somehow deficient, but that flies in the face of historical evidence and precedent. In the War of 1812, for example, the AEA was not invoked against all British subjects, but instead invoked only against those within 40 miles of the tidewater. Similarly, President Wilson and President Roosevelt invoked the AEA against only subsets of citizens of Austria, Hungary, and Germany, respectively, for World War I and World War II. And the DC Circuit has upheld those more limited invocations of the, of the AEA as to only subsets of subjects of enemy nations, um, saying that it was, uh, the, that the proclamations there validly, uh, targeted, quote, less rather than greater in scope than the act. And we think similarly here, the president could validly determine to name only some subjects or citizens of Venezuela, mainly those that are TDA members rather than all subjects, uh, or citizens of Venezuela. The government's revised notice policy also satisfies due process. The Supreme Court's decisions in JGG and AARP provide that AEA designees must receive, quote, or receive notice, uh, that they are subject to removal under the act, end quote, that such notice, quote, must be afforded within a reasonable time and in such manner that will allow them to actually seek habeas relief, end quote, and to actually seek relief, a detainee must have sufficient time and information to reasonably able to contact counsel, file a petition, and provide appropriate relief. The revised notice policy now does all of those things. Specifically informing aliens, they can challenge their AEA designations by filing a habeas petition in their districts of confinement, and it provides both a list of attorneys upon request and the ability to call them or family members who in turn could call those, uh, those counsel by phone. Well, counsel, let me emphasize a few words that you quoted from JGG. I suppose there may have been in our Supreme Court remand opinion too. Uh, they must have enough time actually to seek habeas relief, uh, sufficient time, information, reasonably to be able to contact. How do we know what is reasonable in this case? You've heard my exchange with your, uh, opposing counsel, uh, a while ago. I may not have been clear what I was asking, but to the extent you understood, do you have any reaction to that? How can we know what is reasonable in Anson, Texas and wherever else these, in, these detainees are, uh, without Judge Hendricks looking at it? Your Honor, I think you can look to a couple, uh, couple sort of benchmarks or evidence here. I think first of all, uh, individual aliens that have filed habeas petitions all have done so, I believe, within 17, 72 hours of their designation. So everyone that has previously filed has done so quite rapidly. Didn't all of those who have filed have attorneys already because they were in immigration proceedings? Uh, Your Honor, I, I, I believe certainly most of them do. I don't know definitively whether they all did, um, but, uh. What about the people who don't have counsel? They're, they're provided a list of counsel that they could call, you know, in their daily phone access that they could reach. Only upon request? Uh, it's, it's upon request, yes. Uh, sorry, Your Honor. Didn't Judge Haynes, in the opinion that was attached to the Rule 28J letter, find that the government's proposed, the same notice that's been proffered here, uh, was insufficient because seven days wouldn't be enough time if someone was transferred? Your Honor, I, I, there are district court rulings that have held as much. Uh, I, I don't believe those are correct. I think that, you know, all you have to do is file a habeas petition. It is a short, plain notice under Rule 8. Essentially, the key component to that is just to say that you're not a member of TDA. Can I pause you on that? Because I don't understand how that's judiciable either. Like, Ludecky says you don't get judicial determination of whether you're actually dangerous. So, why would the habeas proceeding involve a factual dispute over whether you're a member of TDA? Your Honor, I, I think because what's been recognized as not reviewable is the President's determinations that the, that the, uh, prerequisites for the AEA have been met are not reviewable. Uh, I think the Supreme Court has drawn a different line as to the individual determinations made by DHS. I'm, I'm curious about that because in, in the, in the JGG opinion, the Supreme Court cites Ludecky footnote 17. It says this is the, this is the that we are sending back. This is the, when they say the courts of, the federal courts have the power to review legal interpretations of the Alien Enemies Act, they say see Ludecky footnote 17. Ludecky footnote 17 in turn says the kinds of questions that we can determine are, are the alien, is the alien in fact a citizen of a different country here in Venezuela? Is the alien over the age of 14? Right? These are statutory. Presumably also we could determine whether the alien is a naturalized citizen of the United States, right? All three of those are terms that come out of the AEA and are referenced in Ludecky footnote 17. But the entirety of the Ludecky opinion says the actual determination of whether you meet the terms of the president's proclamation that is actually dangerous and hence subject to AEA removal is completely outside the purview of the federal courts. That, that's, I don't, and if someone has a different reading of Ludecky, I would love to see it, but I, I'm having a hard time understanding. You are, I'm, I confess to having some trouble understanding that myself. Uh, it does seem that the Supreme Court is anticipating some individualized review of those determinations. Um, in Ludecky, I think the part of the reason that was rejected is because the adjudication was under dangerousness, which was a creation of not the presidential determination, but rather attorney general regulations. And they said you couldn't have judicial review of those particular findings. Um, the Supreme Court here, it seems to anticipate that you would have, be able to get individualized review about whether or not you're in fact a member of TDA. Um, so we have, we have taken that premise and crafted our notice policy with that premise in mind. Um, and you know, under those terms, you, the habeas petition that you have to file is actually quite simple. It's basically just a denial that you are in fact a TDA member. And once you file that, the government is committed not to removing you pending the adjudication of that. And so this is not asking people to create a lot of factual records or detailed factual assertions. It's simply asking them to file a habeas petition that what, that in substance simply says you've wrongly decided, determined that I'm in TDA. And we, we think that the, the... Counsel, before you leave that, getting back to JGG, which I think is what maybe, uh, you were indicating earlier, it says, um, uh, well, if I held on better to where my spot was, it does indicate in here that, oh, here we go, under the proclamation, they must have sufficient time for judicial review as to questions of interpretation and constitutionality, constitutionality as well as whether he or she is in fact an alien enemy, 14 years age or older, and then says in the parentheses under the proclamation, the term alien enemy is defined as, it includes being a member of TDA. So it seems to me the position you were taking is that it is part of the review that if it's indeed challenged, only if it's challenged in habeas, part of the government's obligation is to show that this person is a TDA member. That's correct, Your Honor. The notice policy is designed with that in mind that people can contest whether or not they are in fact TDA members. Um, and I, and I think that the nature of that inquiry makes highly relevant expedited removal as a relevant analogy, uh, where it's often conducted in less than 24 hours. Uh, aliens in those 24 hours have to come forward with essentially, you know, their entire theory of why they have a well-founded fear of ex, uh, of, uh, persecution, and if they fail to do so and lose before, uh, an asylum officer, uh, they get a very quick appeal to an IJ, and that's often resolved in less than a week. And so those, and that, by the way, is a much more fact-bound determination, whether or not you have a well-founded fear of persecution that turns on many more factual permutations than simply, you know, putting I'm not a TDA member in a habeas petition. That is not something that is terribly difficult to do in seven days. And so that's why we think that, that the much greater, or, you know, the, the equivalent time, it's actually much greater than the 24 hours that most expedited, uh, expedited removal, uh, proceedings occur in, makes this, uh, is a very useful benchmark and shows that this comports with due process here. Counsel, the petitioners have proffered affidavits that talk about why more time is necessary. What facts can you point to in the government, in the record, show that seven days is enough? Your Honor, that record hasn't been, uh, hasn't been developed, that, uh, the seven-day notice policy was, was, uh, you know, created after, uh, during the pendency of the appeal here. Um, but I think certainly the analogy to, uh, expedited removal provides very powerful evidence to that. I think the, you know, the, the timing that other habeas petitions have been filed in, I think, uh, you know, we also cited the case law that recognizes that, you know, due process is often done in a matter of days. I think another relevant analogy is that, you know, you have to file, I believe, a notice of appeal in criminal cases in 10 days and very sub, severe and substantial consequences attend to the fact that if you don't file in those 10 days and, you know, that is a very, another very relevant benchmark here that we think supports that, uh, that, uh, the notices here. Um, I also would say given how skeletal the record has developed, I think at most what you have before you is a facial due process challenge. I don't think, you know, you can credibly believe that there's a as-applied due process challenge here and so I think you would have to resolve it as a facial matter and if there were to be any sort of as-applied, that would need to be flushed out on remand. Counsel, let me take you back to predatory incursions. If we do end up defining and deciding whether the President's proclamation fits, what do you make of, of, uh, ASR, I may have my initials wrong, but Judge Haines, Pennsylvania, uh, and her several phrase, maybe all one sentence, definition of what is required, an organized group doing a variety of things. Do you endorse it or do you have any other approach that you think is better? Your Honor, we largely endorse that. Uh, she took a, that, uh, the, the judge there whose name I, escaping me, but the Western District of Pennsylvania, um, did have a slightly narrower definition, but we, we can certainly squeeze within that definition readily and, and without issue. I mean, I, I think, uh, you know, she want, she said that it was a hostile entry in the United States by a cohesive group of individuals such as a military detachment or a designated foreign, uh, organization who are united by common goal of, uh, causing significant disruptions of public safety. I mean, I, I think that is certainly a definition the United States can live with and, uh, uh, one under which the proclamation is plainly legitimate. Uh, there's been criticism of that, including in, in the Brennan Center and, uh, Cato Institute, um, Amicus Brief. That really is, is overbroad that it allows an enormous number of criminal activities that have some connection to a foreign country, whether it's Mexico or further south. Uh, and that does seem to have some purchase to me. It may not be controlling, it may not be accurate, but it does seem to me this sort of floating above, military is in there as an option, but didn't any other organized group would work as well according to that definition. Um, it does seem to me that that kind of definition would probably cover an awful lot of the difficulties we have in this country today with, with organized criminal activities that may have some connection to a foreign country. Your Honor, I think, uh, I think that the definition provided there is, is significantly more limited than the, the critics would, would say, and I think in, in two very important ways. One is this is not an ordinary criminal gang. This is one that is, uh, as set forth by the proclamation, hopelessly enmeshed with the Maduro regime and carrying out activities, including assassinations of critics of the regime at the direction of, you know, of that regime. So that, that is not common. That is not a common feature of many gangs. That is almost too egenerous. Um, I can't think of another gang offhand in the world that is like that. You could think of some other proxies like Hamas, perhaps that have similar characteristics, but that is, that is not a common aspect. I think a second very important limitation in that definition is that they are a foreign terrorist organization. And despite, you know, petitioners attempt to poo-poo that, that is, foreign terrorist organization is a big deal. That is something that presents very substantial dangers to, uh, the United States and our national security as well as our public safety. And that is not something, that is not a characteristic shared by many gangs. That is a characteristic that is quite rare, um, and is one that, you know, that reflects the particular dangerousness for, you know, that TDA poses, including, again, they're in more than 40 states in the United States. That is not common. And they've taken over entire apartment buildings where they've acted as a law to themselves. That is, these are very unique factors that are not, you know, that help TDA radically squeeze within the definition that Western District of Pennsylvania has provided, but are not, you know, broadly shared. All right, counsel. Thank you. Thank you, Your Honors. Thank you, Your Honors. Um, I have a bunch of stuff I am hoping that, I know I've, you've been very generous with the time. I just want to try and run through as many things as, as possible quickly. Just very quickly on the due process point, nobody has filed one without counsel. It's very difficult. I know, for, to my friend who says it's easy, it's easy for him. As a lawyer, it is not easy for these detainees and it is not easy for them to reach lawyers. And so, that, that's the first thing on due process that, and the administrative procedure he was talking about, the expedited removal, that's where the individual is with an officer, doesn't have to file something in federal court, just has to say, I would like to have a fear screening. So, that's on due process. I want to return to Judge Oldham's question. I think Hamdi is the kind of case that you're . . . Hamdi involved an American citizen and was a habeas case? So, what is, what about Hamdi? Well, I think because what the court said and then it's, the D.C. Circuit has gone forward with Hamdi, is that you can make a factual determination of whether the actual hostilities are ongoing, notwithstanding the president saying that. So, I would urge the court to look at Hamdi and its progeny in the D.C. Circuit, uh, to see that the court has a role, Hamdi said the court has a role to decide whether there is actually a military conflict. But again, I, I really would stress, and, and I know this doesn't go to your point, Your Honor, about whether there's predatory incursion, but it does go to your point about whether there's military conflict. I really think it's difficult to say there's a military conflict going on if the government itself is not willing to. And I, the government mentioned the FBI report. I think Your Honors ought to look at that very closely. Medium confidence, seven indirect sources who may have been motivated, very wishy-washy. The government is stressing you look at the FBI report. I think they're protesting a little too hard to have you not accept, as in the supplemental record, the national intelligence assessments. That's 17 national intelligence assessments that disagree directly with the FBI and say, this gang is not acting at the direction of TDA. So that's why I think these are not technical drafts. Counsel, just yesterday, the chief Shiite cleric of Iran declared fatwa on the president of the United States. If the president responds to that with a new proclamation under the AEA as to however he would define the particular members that would be sleeper selves for the Iranian regime in the United States, could a federal court countermand the president's threat assessment about sleeper cells in response to an Iranian fatwa? Well, Your Honor, first of all, they would have to name Iran, but I get your, but I want to go to Venezuela, name Iran. But then Your Honor, I don't think we'd have to look at the facts. The fact that you can construe the statute to require military conflict doesn't mean that we win on the merits in every case. That case may be, is that a military conflict? If an Iranian fatwa activates sleeper cells in the United States, is that a military conflict under your understanding of the AEA? Because military conflict does not appear in the statute. So does it trigger the AEA in your view? Yes or no? I mean, I think we'd have to see more facts, but if it was an armed force coming in... I didn't say armed force, I said sleeper cells. Some kind of organized sleeper cell that was organized to do destruction, that kind of the way a military force would, then I think, you know, but it would turn on sort of the specifics. But what I don't want to see... It doesn't have to be military, right? You're saying it just needs to be organized, so it doesn't have to be... But military or something akin to military is what Judge Henderson said. What about taking over an apartment complex? No, I mean, that's what I wanted to sort of get to, Your Honor. So sleeper cells... Implications are so serious of what the government is suggesting, and I think Your Honor, you know, put his finger on it with talking about ASR's broad reading. Every single nationality and ethnic group in this country throughout history has been tied to a gang, and they all have been entwined at some point with their foreign countries. We did not invoke the Alien Enemies Act for the mafia in the 1950s and 60s. There was no question someone could have written a proclamation saying they're entwined with the government of Italy in some respects. I mean, I think, you know, the government's saying to look beyond the face of the proclamation, then you really need to look at our experts, and you really need to look at the intelligence assessment. I mean, the Supreme Court has repeatedly said, look with skepticism at a new interpretation of a statute that's more than two centuries old. This has been invoked three times, only in major, major wars. The government is now suggesting you can invoke it with a gang and saying, well, this is a very serious gang. Its own experts don't say it's a very serious gang, but that's not our point. There may be very bad guys doing very bad things. Well, counsel, part of what's going on, you have a lot you wanted to cover, but Respondent, Mr. Henson, said something towards the end that has some meaning to me, and is an issue in this case, it seems to be. War changes. The risks and dangers to the country changes. To what extent is this 225-year-old statute fit the situation, or does Congress need to get involved and change it? Congress is sitting there, and they can change the statute, though I think it would go the other way. It seems to me what the government, it's not part of their principle argument, but Mr. Henson closed with, you have something like Hamas and Hezbollah that are significantly assisted by a foreign enemy, maybe, of the United States, Iran. This TDA may not at all be the equivalent. You can go through all sorts of things to distinguish them, but nonetheless, to the extent Venezuela is operating through TDA, it is doing some of the same things that its surrogates. Why can't the AEA fit that situation as a predatory incursion by enemies of the United States? I think what the proclamation is alleging is really just sort of crimes, and it uses the word crimes, and if there was any doubt about what the proclamation is alleging, I would urge the court to look at Mr. Smith's declaration, the government's declarant. He mentions crimes dozens of times, criminal activity needs a law enforcement response, never military. This would not have been understood as the type of either invasion or armed collective force coming into this country and retreating to do damage. The government's definition it's offering you of coordinated destructive activity fits so many different things. Pirates, they were not coordinated with national government. Indians, they might have been in armed force, but I think that to say that this meets it, and with the proclamation's fuzzy language and the government's own declarants and the intelligence assessment would open this up so beyond anything the framers could have meant. We have to name Venezuela in the proclamation. The government has to name Venezuela in the proclamation because that's what the whole framework is about. Everyone from Venezuela is an enemy, and I want to go to Judge Oldham's point about the government with respect is wrong about how World War II and World War I proclamations work. Those name the whole country, and then what the government did is say, we're going to only restrain, detain, and remove a subset, those who were in World War II, those who were dangerous, but it named the country. Where the president has complete discretion, this is what Ludecky was talking about, is to decide which subset of all the nationals of a country are going to be subject to restraint, detention, and removal. That's what the second sentence of section 21 is about. That's where the discretion comes in. In World War II, there was no court review of whether someone was dangerous. That's partly because there was an administrative board, a civilian board that looked at it, but what there was is whether you fell under the proclamation. There were countless cases which we've cited, principally from the Second Circuit where the cases arose, saying if someone's not a German national, not a national of that country, the court can review it. Well here, the government has named TDA as the person, the proclamation. That's why you can review whether they come within the proclamation. That's different than the way World War II was set up, where they named Germany and you decided you come within the proclamation if you're a German national. The subset of people who could be deported were only those who were considered dangerous. That's what footnotes 8 and 17 are about in Ludecky. Counselor, you have much to cover. I'll give you one more item, but your time has run out a while back. Yeah, Your Honor, I appreciate the time. I would just end by saying I do think that ultimately when you go back and think about this, the government has not given you a response to the whole alien enemies concept, that that's what this was about, that you needed to name a country. We are not suggesting, the government's not suggesting, I mean, that everyone from Venezuela is now an alien enemy, but that's what this statute was about. Thank you, Your Honors. All right, Counselor. Thanks to you both and the teams that came with you, the assisted that I imagine. I will take this case on advisement. We are adjourned. Thank you.